In re ESTATE of JOHN T. HOLDING, Deceased.
—457 S.W.2d 545.

Middle Section. October 31, 1969.

Certiorari Denied by Supreme Court May 4, 1970.

Robert T. Beaty, Jamestown, for appellant.

John E. Appman, Jamestown, for appellee.

SHRIVER, P.J. (M.S.). This case involves a claim against the estate of John T. Holding, deceased, filed by his son, Pat Holding, "For the value of services rendered to John H. Holding and Mary Holding at the request of John T. Holding, from 1956 through May 26, 1967, the services consisting of feeding, washing, housekeeping, and nursing of the said Mary Holding and John T. Holding and the general management of their home."

The claim which is for $20,000.00 was filed in the County Court of Fentress County on February 29, 1968, and an amended claim was filed in said Court on April 19th 1968.

The cause was certified to the Circuit Court by the County Court Clerk of Fentress County in accordance with T.C.A. sec. 30-517, and came on to be heard on the original claim, as amended, and the exceptions thereto, before Honorable William I. Davis, Jr., Circuit Judge, and a jury, on August 16-19, 1968, and resulted in a verdict and judgment for the claimant in the amount of

$7,100.00. After a motion for a new trial was heard and overruled, the cause was appealed to this Court and assignments filed.

## ASSIGNMENTS OF ERROR

### I.

The Court erred in overruling exceptant-defendant's motion for a directed verdict at the close of claimant's proof.

### II.

The Court erred in overruling exceptant-defendant's motion for a directed verdict at the close of all the proof in the case.

### III.

The Court erred in overruling exceptant-defendant's motion for a new trial, in that there was no evidence on the trial of the cause to support the verdict of the jury.

## THE FACTS AND OUR CONCLUSIONS

John T. Holding died intestate on May 26, 1967, a resident of Fentress County, Tennessee, leaving as his only heirs at law nine children, including the appellant and appellee here. The claimant, appellee, Patrick H. Holding, qualified as administrator of the estate and some 11 months following his qualification as administrator, he filed the claim hereinabove mentioned.

In testifying as to the financial condition of his father, John T. Holding, Patrick Holding, the administrator and

claimant, stated that his father's bank account had steadily increased from the time he, Patrick Holding, had returned home to look after his parents in 1953 through 1967, when his father died; that his father made periodic transfers to a savings account; that as administrator of his father's estate, he had filed an inventory showing personal assets of $21,609.16; that his father had paid $15,000.00 in cash for the Jamestown cafe in 1965; that his parents owned considerable real estate, consisting of farms and other property in Fentress County and he estimated his father's net worth at the time of his death to be $100,000.00; and that the funeral bill was about the only debt of the estate (except his claim).

Defendant testified that he was 57 years old and that he had returned to Fentress County from Muncie, Indiana, in 1953, prior to which time he had worked at various plants in Indiana; he had been married and had three children and that he was divorced in 1948, and that at the time he returned to Fentress County in 1953, he was single. He stated that he had worked at several industrial plants in Indiana before returning to Fentress County and he estimated that his average wages amounted to $3,500.00 or $4,000.00 a year; that he served in the army in World War II, and had special training with the medical corps. When asked whether any of his brothers and sisters were living in Fentress County at the time he returned, he stated that his oldest sister lived there but that she was not in position to take care of his parents who, at that time, were quite old and living alone. He stated that at the time he returned his parents were living on a farm which was in very bad condition but there were 98 head of cattle on this farm. He testified that he came back home to look after his elderly parents and that

he cooked and cleaned house the best he could, fed his mother who was crippled with arthritis and who was confined to bed and a wheelchair after she broke her hip in November 1956, and was never able to walk again; that, in the latter years of her life until she died in 1964, he had to perform every kind of personal service for her, such as helping her in and out of bed, taking her to the bathroom, etc., etc. During much of this time, his mother was unable to control the functions of her body and he was her only help.

He testified that he looked after his father's business and helped him with various services until the time of his death at the age of 90 years.

The claimant insisted that for years he was on duty looking after his mother and father 24 hours a day seven days a week except that occasionally one of the other children would come and stay for a short while, giving him some temporary relief from these duties.

The claimant testified that he expected to be paid for his services and that from 1953 through 1956, his father did partially pay him. Numerous checks were introduced as exhibits showing payment by John T. Holding to the climant designated "for work." He testified that during the period in question he was paid the total of $2,831.95 by his father by checks with the notation thereon "for work" and that his father also paid $591.35 on his behalf for court fines and costs.

He filed a number of checks drawn by John Holding in favor of his other children, one such check being paid to Sam Holding for $10.00 "for taking him to a doctor in Knoxville."

Two checks introduced as exhibits were drawn by John Holding to his daughter, Rurie Reynolds, in the amounts of $15.00 and $10.00 respectively, designated for "housework." Among the checks filed as exhibits is another made out to Earl Holding designated "for work" and two other checks payable to Lowell Holding both designated "for work on farm". Still another is made to Gomer Holding for $25.00 and designated for "work".

As reflecting on the question whether or not there was a contract expressed or implied to pay for the services of the claimant, he was asked why he returned to Fentress County and his answer was "my father and mother asked me to". But this question and answer were objected to and the objection sustained.

Further, on testifying about the services he performed for his mother and father, the following appears in the record:

"A. Sure. I had to clean her. There was no way out of it.

Q. Did you provide such services seven days a week?

A. Yes.

Q. And from the date of your mother's death until the date of your father's death, did you provide the services for him?

A. Yes. I provided services for him ever since I come back here. I looked after his business. I had to go down on the farm. Even after my mother broke her hip, I would have to put her back in the bed and go down there and work for him to wait on her in the bed and then after she passed away,

then, of course, then I had to cook for him. Of course, he was in fairly good health. When she first passed away, he could come to town when he got ready. He could—but, still, I had to see after him. According to our contract—

MR. BEATY: Your Honor, I object to that.

MR. APPMAN: Don't go into that.''

And testifying about the checks that were made payable to him and marked ''for work'', he was asked if he received those checks for work performed by him for his father and his answer was ''Yes, I received partial payment for work that I—.'' This was objected to and the objection sustained.

On cross-examination, defendant was asked about his reason for leaving Muncie, Indiana, to return home and he testified as follows:

''Q. You didn't have a job. Is that right?

A. Yes. I could have had a job in South Bend—I was offered a job. Before I came back down here.

Q. No. You didn't have a job here?

A. Yes. I had a job here when I came back because he told me to come back that he would make a deal with me.

Q. I didn't ask you that?

A. Well, you are wanting the truth, ain't you?

Q. I didn't ask you that—

THE COURT: Disregard that statement of the witness, gentlemen of the jury. Just answer the question now and let's get along.

Q. Alright. Now, after you came back from—now, after you came back to Fentress County, your father's business, as far as it reflected in the bank account, the joint account of your mother and father, increased. Isn't that correct?

A. Now, how is that, Robert?

Q. I mean the bank balance ran a little higher as long as you were here, after you came back in '53?

A. Yes. It did."

*Mrs. Emma Rains* was called to testify in behalf of the claimant. She stated that she had known John Holding and Mary Holding all of her life and that she had been in their home numerous times. She stated that Mrs. Holding had stated to her that she, Mrs. Holding, could not have gotten along without Pat because he had even taken her to the bathroom.

At another point, she testified on cross-examination as follows:

"Q. In other words, you don't know whether he said I have taken care of Pat or I will take care of Pat. In other words, he could have said, I have taken care of him? Is that right?

A. Well, he just said,—he said that he had made a trade that he would take care of Pat."

*Mrs. Clark Choates* was called to testify. She stated that her place joined that of the Holdings and that she had visited them a number of times and on one occasion she and her daughter were visiting Mr. and Mrs. Holding and the daughter was asking about Pat staying there and

not working, and she was asked if she remembered exactly what Mr. and Mrs. Holding said, whereupon, she answered:

"A. They claimed—my daughter was speaking about him not working and she said that nobody could take care of her like Pat. That he could lift her around and take care of her better than anybody else. And she said that we aimed to see that he gets paid for it and we aim for him to have a home. My daughter was talking to them."

*Mr. Reeder,* a former Tax Assessor of Fentress County and a minister of the Gospel testified at length, and among other things, stated that Mr. John Holding had cattle on his farm back in the late 50's and was physically unable to look after them although he was able to get around, and that his son, Pat, looked after the cattle and the farm.

*Judge P. G. Crooks,* County Judge of Fentress County, testified that although he could not quote Mr. John Holding verbatim, he had said that he didn't know what he would do without Pat and that Pat had quit his job and had come down to take care of him and his wife. On cross-examination, he stated:

"A. Yes. He said—he said 'Pat has been an awful lot of help to us and I didn't know how we would have gotten along without him', and he said, 'I hope to make it right with him'. Or something to that effect. Now, I don't know the exact words."

The appellant insists that the question posed by this record is whether Patrick H. Holding, the claimant, proved that a contract existed between himself and his father,

John Holding, for compensation for services rendered to the said John Holding and his wife Mary Holding, and that the claimant Patrick H. Holding did not overcome the presumption that his services to his father were gratuitous due to the close relationship of the claimant to John T. and Mary Holding.

On the other hand, counsel for appellee insists that the issues for determination in this Court are not whether the appellee, by a preponderance of the evidence, proved a contract either expressed or implied, or whether he overcame the presumption that services rendered to his father and mother were performed gratuitously, but that the single question is whether or not there is any material evidence to support the verdict of the jury.

Counsel for appellant cites and quotes from Cotton v. Roberts' Estate, 47 Tenn.App. 277, 337 S.W.2d 776, wherein it is said that the rules of contract law applicable to a case of this kind may be summarized thus:

"In order to make out an implied contract for the rendition of services, facts and circumstances must be shown which amount to a request for services which is the offer to contract and the performance of the requested services which is the acceptance of the offer."

We think the evidence in this record is sufficient to sustain a finding that there was a request by John T. Holding and his wife for the services involved here.

In Cotton v. Roberts' Estate, supra, it was further said that any conduct from which a reasonable person in the offeree's position would be justified in inferring a promise in return for the requested act, amounts to an offer, and that such a request might be implied when the

facts and circumstances are such that the person receiving the benefit of such work or services know, or reasonably should have known, that the person doing the work expected to be compensated.

In the Cotton case, supra, it is further held:

"As to services performed by a member of the family on behalf of another member of the same family, there is a presumption, which grows weaker as the relationship recedes, that the services are rendered gratuitously, from motives of affection and duty, and to entitle one in that situation to recover compensation therefor, the burden is upon him to overcome the presumption by showing either an expressed contract or such exceptional facts and circumstances as will establish an intention on the one part to charge and on the other part to pay, notwithstanding the relation of kinship."

█ In view of the exceptional circumstances shown by the record herein to the effect that this claimant, who was one of nine living children of John T. and Mary Holding, and who left gainful employment in Indiana where he had been for several years to come home and look after his invalid mother and aging father, waiting on them day and night and attending to the farm, the livestock and even running the restaurant belonging to his father together with the other circumstances shown in the record, we are persuaded to believe that there is substantial material evidence to support the verdict in this case.

As to the force and effect of a jury verdict in a case on appeal, see Poole v. First National Bank, 29 Tenn. App. 327, 196 S.W.2d 563, 564; Tallent v. Fox, 24 Tenn. App. 96, 141 S.W.2d 485; Rose & Company v. Snyder, 185 Tenn. 499, 206 S.W.2d 897, and many cases.

From the foregoing, it results that the assignments of error are overruled and the judgment of the trial court is affirmed.

Affirmed.

Puryear and Todd, JJ., concur.